# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW CESTRA, | Civil Action |
| Plaintiff, | No. |
| v. | |
| MYLAN, INC., | |
| Defendant. | JURY TRIAL DEMANDED |

## CIVIL COMPLAINT

Plaintiff, Matthew Cestra, by undersigned counsel, files this Civil Complaint and in support alleges the following.

### I. Jurisdiction

1. The jurisdiction of this court is invoked pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3730(h)(2), as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010; and 28 U.S.C. § 1331.

### II. The Parties

2. Plaintiff, Matthew Cestra, is a adult individual who resides at 310 Pine Valley Drive, Bridgeville, PA 15017. At all times relevant hereto, he was an employee of Defendant, Mylan, Inc.,within the meaning of 31 U.S.C. §3730(h)(1).

3. Defendant Mylan, Inc., is a corporation.  Its maintains a place of business is 1000 Mylan Boulevard, Canonsburg, PA 15317.

### III. Factual Background

4. Defendant Mylan, Inc. is one of the largest generic and specialty pharmaceutical companies in the world, manufacturing and marketing more than 1,300 different products to retail,

wholesale, government and institutional customers.

5. Cestra worked for Defendant from September 1, 2011 to May 8, 2014. He last held the position of Vice President of Marketing.

6. In each of the three years of his employment, Defendant rated Cestra as "exceeds expectations" in his performance reviews.

7. Indeed, Defendant was so pleased with his performance that it promoted him from Senior Director of Marketing to Vice President of Marketing in 2012.

8. Cestra's last performance review for the calander year 2013 was presented to him in March, 2014. However, pursuant to Defendant's policies and normal practice, the evaluations for the 2013 Review were required to be in the system and locked down for employees by December 6, 2013.

9. Thus, Defendant already had determined that Cestra's 2013 review would be "exceeds expectations" back in December, 2013.

10. In or about the year 2010, Cestra filed a Complaint as a Relator pursuant to the False Claims Act, 31 U.S.C. §§3729(a)(1)(A) (B) (C)(G), and 3730(h), in the United States District Court for the Southern District of New York arising from conduct by his then-employer, Cephalon, Inc.

11. The Court originally ordered Cestra's case unsealed on January 9, 2013. The docket was not actually unsealed until March 18, 2013. At that point, only the original complaint was unsealed, identifying Cestra only as John Doe.

12. The first amended complaint was unsealed by court order on May 2, 2013, though it too only identified the relator as John Doe. Cesta was not identified by name until July 10, 2013,

when Cestra first filed a response to Defendant Cephalon's motion to unseal Cestra's identity.

13. On or about February 10, 2014, Cesta was identified as a Whistleblower on the Mylan page of Café Pharma, a web site for the Pharmacy industry, and his involvement in the action against Cephalon was publicized.

14. Concerned about the effect this could have on his Mylan employment, on or around February 10, 2014, Cestra wrote an email to his direct supervisors, Joe Duda, President of Mylan Pharmaceuticals, Inc.; Debra O'Brien, Global Chief Marketing Officer; Tony Mauro, President of North America; and Tom Pirozzi, Chief Compliance Officer for North America alerting them to the Café' Pharma posting, and assuring them that he was not engaged in any form of "whistle blowing" against Mylan.

15. Shortly after, Duda phoned Cestra and chastised him for emailing all those people. Duda told Cestra he did not want Cestra to send him emails or texts moving forward because he did not want to get "embroiled in a deposition."

16. Cestra did text Tony Mauro, President of North America, letting him know that Duda told Cestra he did not want Cestra emailing or texting him anymore. Mauro is Duda's boss.

17. Throughout the remainder of February and March of 2014, Cestra tried to schedule multiple meetings with his other boss O'Brien, but she would not schedule a meeting with Cestra. O'Brien would either cancel, reschedule or just not show up for any meetings she scheduled with Cestra.

18. Since Cestra was the Vice President of Marketing for the largest business Unit at Mylan (Cestra's business unit brings in about 75% of Mylan's total revenue,) it was unusual for O'Brien not to agree to meet with Cestra.

19. Additionally, following the Café Pharma posting, O'Brien treated Cestra in a hostile manner, yelling, screaming and cursing at him in meetings in front of others, which she did not do prior to Cesta sending the email about the Café Pharma post that he was the whistleblower.

20. On May 8, 2014, Cestra was invited to a meeting. In attendance was O'Brien, as well as the Vice President for Human Resources and the Global Chief Compliance Officer, Brian Roman.

21. No compliance issues were discussed, and so Roman's presence had no apparent purpose.

22. During the meeting, Roman asked Cestra if he had said something in a previous meeting concerning Mylan paying the Federal Food and Drug Administration to assure Mylan's Auto Injector, for generic Copaxone, would be approved?

23. In response to Roman's question, Cestra said he did not accuse Mylan of paying for FDA approval. Rather, Cestra explained, he had noted that Mylan paid a "fee" to the FDA to more quickly obtain FDA approval.

24. Cestra had learned that an agreement existed between SHL, the company that developed Mylan's auto injector, and another pharmaceutical company, Sandoz.

25. The SHL/Sandoz agreement provided that if SHL developed a Copaxone auto injector for any other pharmaceutical manufacturer other than Sandoz, then that other manufacturer may not launch its auto injector until a period of 90 days after Sandoz launches its generic copaxone auto injector product.

26. To date, Mylan had not released this potentially material information to the public, via an Securities and Exchange Commission Rule 8-K statement.

27. On information and belief, Defendant learned that Cestra was discussing this issue

in a meeting for the purposes of "problem solving:" and having just recently discovered Cestra was identified as a Whistle Blower, quickly fired him.

28.  O'Brien informed Cestra he was discharged immediately due to his performance "over the last several weeks."

29.  Cestra's performance was no different "over the last several weeks" than it was in March when he was rated "exceeds expectations."

## Count I
## 31 U.S.C. § 3730(h)

30.  Cestra incorporates by reference the allegations in Paragraphs 1 through 29 as if fully restated herein.

31.  As set forth above, in filing *U.S. ex rel Matthew Cestra, et. al. v. Cephalon, Inc.*, Cestra engaged in lawful acts in furtherance of an action under the False Claims Act and in an attempt to stop one or more violations of the False Claims Act.

32.  Cestra's filing suit under the False Claims Act was in good faith and constituted protected activity pursuant to the False Claims Act, 31 U.S.C. §3730(h).

33.  Defendant knew that Cestra engaged in lawful acts in furtherance of an action under the False Claims Act and discovered he was the Relator in U.S. ex rel Matthew Cestra in early 2014.

34.  Defendant on May 8, 2014 fired Cestra because he engaged in protected conduct under the False Claims Act, and because he had been identified to Defendant as a "whistlenblower."

35.  Defendant thus retaliated against Cestra because he engaged in lawful acts (he filed a lawsuit as a relator), and did so in furtherance of an action under 31 U.S.C. §3730, in violation 31 U.S.C. §3730(h)(1).

WHEREFORE, Cestra demands judgment and the following relief:

a. That the Court enter a judgment declaring Defendant's actions to be unlawful and in violation of the False Claims Act;

b. That Defendant be ordered to reinstate Cestra and provide him with accumulated seniority, fringe benefits and all other rights;

c. That Defendant be required to compensate Cestra for the full value of double wages he would have received had it not been for Defendant's illegal treatment with interest from the date of the termination, in addition to reimbursement for lost pension, social security, experience, training opportunities and other benefits;

d. That the Court award Cestra compensatory and punitive damages as a result of Defendant's violations of the False Claims Act;

e. That Defendant be enjoined from retaliating against Cestra in any manner that violates the False Claims Act;

f. That Cestra be awarded against Defendant the costs and expenses of this litigation and a reasonable attorney fee; and

g. That the Court award Cestra such other and further relief as the Court deems proper.

Respectfully submitted,

**Samuel J. Cordes & Associates**

/S/ Samuel J. Cordes
Samuel J. Cordes
Pa.I.D. #54874

245 Fort Pitt Boulevard
Pittsburgh, PA 15222
(412) 281-7991

Attorney for Plaintiff